Approved: _____
       JOHN P. COLLINS, JR.
       Assistant United States Attorney

**ORIGINAL**

Before:  THE HONORABLE LISA MARGARET SMITH
        United States Magistrate Judge
        Southern District of New York

16 m 8349

- - - - - - - - - - - - - - - - - - - - - x
                            :   **SEALED**

UNITED STATES OF AMERICA        :   **COMPLAINT**
                            :
     - v. -                :   Violation of
                            :   18 U.S.C. § 1343
AMER HATTAR,                :
                            :   COUNTY OF OFFENSE:
              Defendant.   :   WESTCHESTER
                            :
- - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

      AMY SOLEK, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation, and charges as follows:

COUNT ONE

(Wire Fraud)

The Scheme to Defraud

      1.   From in or about November 2011 through in or about early 2014, AMER HATTAR, the defendant, acted as a financial adviser and solicited investments from individuals. In reality, HATTAR defrauded the investors by taking approximately $450,000 of investor funds and using their money to pay for his family's personal expenses.

Statutory Allegations

      2.   From in or about November 2011 through in or about early 2014, in the Southern District of New York and elsewhere, AMER HATTAR, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to

1

defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HATTAR, acting as a purported financial adviser, solicited approximately $450,000 in investments from several individuals and used the money to pay for personal expenses.

(Title 18, United States Code, Section 1343.)

The bases for my knowledge and for the foregoing Charge are, in part, as follows:

2.    I am assigned to the investigation of the above-described offense.  This affidavit is based on my personal participation in the investigation and my review of documents, conversations with other law enforcement officers, and interviews with witnesses about this matter.  Because this affidavit is submitted for the limited purpose of establishing probable cause, I have not set forth each and every fact learned during my investigation.  Where actions, statements or conversations of others are related herein and where the contents of documents are related herein, they are related in substance and part only.

### Victim-1

3.    I have spoken with an individual ("Victim-1"), a resident of New Rochelle, New York, and who has informed me, among other things, that:

a.    Victim-1 met AMER HATTAR, the defendant, through a mutual friend at a party. At that time, Victim-1 had invested money in an investment fund based in White Plains, New York ("the Fund") and Victim-1 believed that HATTAR was working at the Fund. HATTAR promised Victim-1 and his friend ("Victim-1's friend) a 12% return on their investments. According to HATTAR, the invested money would be used to purchase mortgages and a return would be provided to investors after the mortgage was flipped.

b.    In or about 2010 through in or about 2011, Victim-1 and his friend made a $20,000 investment and some

subsequent investments and eventually received the promised 12% return and the principal. Previously, when Victim-1 made investments through HATTAR to the Fund, Victim-1 received materials documenting Victim-1's investments.  Starting in or about November 2011, Victim-1 did not receive any financial documentation for the "mortgage investments" made with HATTAR.

   c. From in or about November 2011 through in or about December 2013, Victim-1 and Victim-1's family members invested approximately $208,000 with HATTAR-1.[1]

   4. I have reviewed bank records for AMER HATTAR, the defendant, concerning one of Victim-1's checks to HATTAR – specifically a $25,000 check from Victim-1 to HATTAR that was deposited into HATTAR's personal bank account -- on or about June 3, 2013 -- through the use of mobile banking application that can deposit checks into an account through the use of the Internet or a cellular data plan.  I have learned that the check was deposited via "mobile remote deposits" and that the transaction was processed on computer servers running in Texas, California, Missouri and Colorado.

   5. On or about September 22, 2015, in the vicinity of Yonkers, New York, Victim-1 met with AMER HATTAR, the defendant, and under the direction of myself and another agent, Victim-1 recorded his conversation with HATTAR. At that point in time, it had been almost two years since the last investment check was tendered by Victim-1 to HATTAR. At that date, Victim-1 has not received any of the $208,000 of principal and was concerned about his investments. Prior to that date, HATTAR had most recently given Victim-1 checks that were returned for insufficient funds. During the conversation, HATTAR admitted, among other things, that:

   a. HATTAR "should have [been honest with Victim-1 from the beginning] . . . I fucked up because I lied. And I[,] I'll be the first one to admit it. I should have said [to Victim-1] this is what I'm workin on and this is how I'm gonna pay you back. So I panicked."

---

[1] At least four of the checks from Victim-1 and his family members – totaling at least $62,000 – contained a memo description: "Loan."

3

b.     HATTAR was so upset at another manager of the
Fund ("Manager-2") concerning the Fund's allegations that he
said "there was a point when this first happened, I grabbed [my]
AR-15, I was goin' off cause I was gonna shoot [Manager-2]."

c.     HATTAR stated that the investment funds from
Victim-1's mother "[were] never intended to be . . . stolen" and
he did not have any money to give Victim-1 back because he
claimed he "invested all [his] money" into an alleged
investment.

d.     The $22,000 from Victim-1's mother was not
invested but instead went to paying office expenses and bills.

e.     In response to a statement by Victim-1 that his
money was to be invested with the Fund and that HATTAR had not
done that, HATTAR stated: "I'm not gonna justify it . . . It
wasn't done the right way . . . I'm mannin' up to it."

f.     In response to a statement by Victim-1 that
HATTAR stole his money, HATTAR responded: "[A]t the end of the
day, there's [no way] of justifyin[g] it."

### Victim-2 and Victim-3

6.     I have spoken with two individuals ("Victim-2
and Victim-3"), who are married and reside in Chester, New York,
and who have informed me of the following:

a.     In or about early 2013, they were in need of a
financial advisor and Victim-1's friend referred them to AMER
HATTAR, the defendant. In order to pay off their credit card
debt, Victim-2 and Victim-3 applied – with HATTAR's assistance –
for a reverse mortgage. At the time of their reverse mortgage
application, HATTAR suggested that they give him the $100,000
proceeds from the reverse mortgage and he would invest those
funds. HATTAR proposed to give them $1,000 a month which Victim-
2 and Victim-3 could use to pay off the reverse mortgage.

b.     On or about January 30, 2013, Victim-2 wrote a
$100,000 check made payable to HATTAR with the memo description:
"Personal Loan." Victim-2 does not recall why she wrote
"Personal Loan" on the memo description line, but believes that
HATTAR told Victim-2 to write those words on the check.

4

c.    On or about February 1, 2013, at a Bank of America branch in Florida, the $100,000 check was deposited into HATTAR's account in New York.

d.    For approximately eighteen months, HATTAR made payments of $1,000 per month to them – primarily in cash – and sometimes delivered by a stranger. In September 2014, a check for Victim-2 and Victim-3 from HATTAR in the amount of $3,000 bounced and they are still owed over $80,000.

### Victim-4 and Victim-5

7.    I have spoken with an individual ("Victim-4"), who resides in Scarsdale, New York, and who has informed of the following:

a.    Victim-4 knew AMER HATTAR, the defendant, socially through Manager-2. In or about 2012, HATTAR asked Victim-4 to loan him $20,000 for two months so that HATTAR could purchase a condominium in Florida for HATTAR's wife.  When the real estate deal fell through, HATTAR paid Victim-4 back in full.

b.    In or about April 2013, HATTAR asked Victim-4 to participate in a commercial venture for which HATTAR needed $75,000 to complete a deal. Victim-4 had HATTAR execute a promissory note for $75,000.  According to the note, HATTAR would repay the full amount plus 12% interest by May 31, 2013. HATTAR did not repay the loan and provided numerous excuses through December 2013.  In December 2013, HATTAR gave Victim-4 a check for approximately $50,000 – which was subsequently returned for insufficient funds. In January 2014, HATTAR again gave Victim-4 a check for approximately $50,000 – which again was subsequently returned for insufficient funds. HATTAR explained the bounced checks by claiming: (1) they were from a joint account and had not been signed by his wife; and (2) he expected a wire transfer from Jordan which did not arrive in time.

c.    On or about January 17, 2014, Victim-4, through one of his companies ("Company-1"), received a wire transfer of $60,000 from a bank in Nevada.  Unbeknownst to Victim-4, the $60,000 came from the account of another investor ("Victim-5").

      d.    Victim-5, who resides both in New York and Nevada, became acquainted with HATTAR because both of them worked in the same building where the Fund was located. Thereafter, Victim-5 had referred clients to HATTAR who were seeking mortgages.

      e.    In or about late 2013 or early 2014, HATTAR approached Victim-5 and falsely claimed that Company-1 was owned by a "big wig" at a large national bank and Company-1 intended to build a hotel, but needed a $120,000 loan in order to pay for the architectural plans. HATTAR stated that it would be a short-term deal, lasting 30 to 90 days, and that Manager-1 would arrange the financing for the project. HATTAR proposed that each of them would put up $60,000. Victim-5 was told by HATTAR that his loan to HATTAR was to be for 90 days at 1.5% interest.

      f.    In January 2014, Victim-5 wired $60,000 to Company-1. A few days later, HATTAR informed Victim-5 that he could not commit to $60,000 and asked Victim-5 to contribute $10,000 more. On or about January 28, 2014, Victim-5 provided a $10,000 check to HATTAR.

      g.    After the 90 days passed, Victim-5 sought the return of his funds from HATTAR – who provided him with excuses including that HATTAR had cancer (accompanied by photographs of HATTAR in a hospital). Victim-5 then called Manager-1 who informed Victim-5 that papers that had been provided to Victim-5 in connection with the $120,000 deal had been stolen from the Fund and were related to a deal that the Fund had rejected.

      h.    Thereafter, Victim-5 researched Company-1 and learned that it had been formed by Manager-1. Manager-1 informed Victim-5 that Company-1 belonged to a client of Manager-1.

      i.    Meanwhile, HATTAR informed Victim-4 that the $60,000 wire transfer had been sent from HATTAR's attorney's account. Shortly thereafter, Manager-1 called Victim-4 and informed him that HATTAR had posed as a principal of one of Manager-1's accounts and orchestrated the wire transfer from another of Manager-1's clients to Victim-4's account.

      8.    In or about early 2014, shortly after the fraudulent wire transfer was discovered, Manager-1 and Manager-2 met with AMER HATTAR, the defendant, concerning complaints from clients that HATTAR had taken funds from people seeking

mortgages and had never processed the mortgage applications. During the conversation, which was recorded by Manager-2:

       a.   In response to questions concerning the fraudulent wire transfer from Victim-5 to Victim-4, HATTAR stated: "[t]hat thing I did was wrong," and he knew that he stole their money.

       b.   HATTAR stated that he took $12,000 of client funds because he had to pay a doctor's bill.

       c.   HATTAR stated that he told a relative, who agreed to repay the funds on HATTAR's behalf, that he "took moneys that [he] shouldn't have. And I gotta pay it back . . . [and] [he] need[ed] three hundred thousand."

       9.   I have reviewed AMER HATTAR's bank records from his checking account covering the time period March 2011 through March 2014 and found very limited evidence of investment activity. Instead, I have discovered that after investment checks were deposited from clients, HATTAR often spent the funds on personal expenses or other individuals. For example, after depositing a check in May 2012 from Victim-1 for $25,000 (with the memo "investment'), in the next four days, HATTAR made the following financial transactions: (a) he wrote a check to another individual for $5,000 (with the memo "Thank You"); (2) he wrote a check to a car dealership for $13,000 (with the memo "Ferrari 360 Down Payment"); (c) a $1,300 cash withdrawal; and (d) a $1,000 credit card payment. In addition, in the week before receiving a check from Victim-5 for $10,000, HATTAR bounced checks totaling over $20,000 – including a check for $9,100 (which was his second attempt at this payment in less than two weeks) to Manager-2.

WHEREFORE, deponent prays that a warrant be issued for the arrest of the above-named defendant and that he be imprisoned or bailed as the case may be.

AMY SOLEK
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
 th day of December 2016

THE HONORABLE LISA MARGARET SMITH
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

8